# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE NORTHERN DISTRICT OF IOWA

| IN RE: | ) | |
|---|---|---|
| | ) | Chapter 7 |
| LARRY ARENDS AND | ) | |
| JANN ARENDS, | ) | |
| | ) | Bankruptcy No. 13-00645 |
| Debtors. | ) | |
| | ) | |

## OPINION RE: OBJECTION TO CLAIM OF HOMESTEAD EXEMPTION

These matters came before the Court on Trustee Wil Forker's Objection to Debtors' Homestead Exemption. The Court held a hearing on this matter on August 27, 2013. Wil Forker, Chapter 7 Trustee, appeared on his own behalf. Attorney Martha McMinn appeared on behalf of Debtors Larry and Jann Arends (collectively "Debtors"). After hearing the arguments, the Court took this matter under advisement. This is a core proceeding under 28 U.S.C. § 157(b)(2)(B).

## STATEMENT OF THE CASE

Before filing for bankruptcy, Debtors cashed in two life insurance policies for $28,000 and paid down their home mortgage. After they filed for bankruptcy, Debtors claimed their homestead as exempt. Trustee brought an Objection to Debtors' Homestead Exemption. Trustee argues that Debtors' homestead exemption should be reduced by $28,000 because Debtors converted non-exempt property into exempt property with the "intent to hinder, delay, or defraud a

creditor" under 11 U.S.C. § 522(o)(4). Debtors resisted. They admitted that they transferred their life insurance equity into their homestead before bankruptcy, but argue this was permissible pre-bankruptcy planning. It does not show the improper intent necessary to invoke 11 U.S.C. § 522(o)(4). For the reasons that follow, the Court concludes that Debtors did not convert non-exempt property and did not act with the "intent to hinder, delay, or defraud a creditor" under § 522(o)(4). Therefore, the Court denies Trustee's objection.

## FINDINGS OF FACT

In April, 1990, Debtors purchased two life insurance policies from Northwestern Mutual. In February, 2013, Debtors met with a bankruptcy attorney for the first time. At that meeting, they were mistakenly informed that the equity in those two life insurance policies exceeded the allowable amount under the Iowa exemption statute. Debtors also learned, however, that any equity they had in their homestead could be claims as exempt.

On March 6, 2013, Debtors cashed out the $28,000 of equity they had in the two policies. The money went into their bank account where it remained for six days while the check cleared. On March 12, 2013, Debtors wired $28,250 from that account to their mortgage company to pay down their home mortgage and increase their equity in the home.

2

On April 23, 2013, Debtors returned to their attorney's office to sign the bankruptcy petition and schedules their attorney had completed since their first meeting. Debtors' bankruptcy schedules were not updated before the bankruptcy filing to reflect the $28,250 payment on their mortgage.

Debtors filed for bankruptcy on April 25, 2013. Debtors claim their home's value is $80,000, with a secured lien of $34,300. They claim the equity in the home is entirely exempt under Iowa's homestead exemption statute.

At Debtors' initial meeting of creditors, the Trustee requested Debtors' bank statements. Debtors realized they left the statements in their car but offered to go and get them. Trustee told them that it would be sufficient if they sent the statements to Trustee the next day. Debtors' attorney sent the statements to the Trustee the following day.

When Trustee examined the bank statements, Trustee discovered the large mortgage payment just before the bankruptcy filing. He filed an Objection to Debtors' Homestead Exemption. Trustee acknowledges that the $28,000 may have been exempt as life insurance, but when it went into Debtors' bank account on March 6, 2013 as cash, it became a non-exempt asset. Trustee alleges that Debtors' then improperly converted that non-exempt asset into an exempt asset when they paid that money to their mortgage company to reduce their loan and increase their equity in their home.

Trustee notes that, at the initial meeting of creditors, he asked Debtors if their schedules were correct and they stated "Yes." Trustee also asked Debtors if they had made any payments recently and they stated "No." Trustee argues that this transfer of non-exempt property to exempt property, combined with the fact that Debtors left the transaction off of their bankruptcy schedules, stated that their schedules were correct, and stated that they had not made any payments recently, shows that Debtors acted with the "intent to hinder, delay, or defraud a creditor" under 11 U.S.C. § 522(o)(4). Trustee argued that Debtors' homestead exemption should be reduced by the $28,000 payment.

Debtors acknowledged that they acted for the purpose of both maximizing exemptions and reducing their mortgage payments because of health concerns. Debtors argued and offered evidence that they did not intend "to hinder, delay, or defraud a creditor" as is required under 11 U.S.C. § 522(o)(4). Debtors stated that they inadvertently left the mortgage payment off of their bankruptcy schedules. Debtor Larry Arends testified that the schedules were originally prepared at their first meeting in February. He said they only "skimmed over" the schedules when they returned to sign the paperwork in April. He noted there was no follow up discussion with their lawyer about the conversion of the insurance money into their homestead. He testified that they both thought the bankruptcy schedules were correct when they answered Trustee's question at the creditor's meeting.

4

Additionally, Debtor Larry Arends testified that he thought that Trustee asked him if he had made any payments **other** than on his mortgage, to which he replied "No."  He testified that he did not mean to defraud or keep money from creditors "in a way that wasn't allowed."

At the hearing, Debtors' attorney took full responsibility for leaving the transaction off of the schedules.  She also admitted that she incorrectly advised Debtors when she told them that the $28,000 in life insurance equity exceeded the exemption limit and suggested that they might want to convert the money into home equity.

## CONCLUSIONS OF LAW & ANALYSIS

### I.    Operation of § 522(o) in an "Opt-Out" State

Section 522 of the bankruptcy code determines exemptions.  11 U.S.C. § 522(b)(3)(A) allows a debtor to exempt from the bankruptcy estate:

> ... any property that is exempt under Federal law, other than subsection (d) of this section, or State or local law that is applicable on the date of filing of the petition at the place in which the debtor's domicile has been located for the 730 days immediately preceding the date of the filing of the petition, or if the debtor's domicile has not been located at a single State for such 730–day period, the place in which the debtor's domicile was located for 180 days immediately preceding the 730–day period or for a longer portion of such 180–day period than in any other place ...

5

11 U.S.C. §522(b)(3)(A).  This "'opt out' provision of § 522(b)(2)(A) allows state law to determine only what property may be exempted from the estate." In re Cleaver, 407 B.R. 354, 357 (B.A.P. 8th Cir. 2009) (quoting In re Graettinger, 95 B.R. 632, 634 (Bankr. N.D. Iowa 1988)).  "Iowa is an 'opt-out' State, which means Iowa has elected to have its exemptions apply in Federal Bankruptcy proceedings as specifically allowed by the Bankruptcy Code." In re Roberts, 443 B.R. 531, 536–37 (Bankr. N.D. Iowa 2010) aff'd, 450 B.R. 159 (N.D. Iowa 2011) (citing In re Hurd, 441 B.R. 116, 118 (8th Cir. BAP 2010); Iowa Code § 627.10).  There is no dispute that Debtors resided in Iowa during the 730-day period before filing bankruptcy.  Therefore, Iowa exemption law applies.

The question then becomes whether the other provisions of the Bankruptcy Code's exemption section, specifically § 522(o)(4), apply when a state has opted out of the federal exemptions.  Section 522(o)(4) provides:

> **(o)** For purposes of subsection (b)(3)(A), and notwithstanding subsection (a), the value of an interest in—
> . . .
> **(4)** real or personal property that the debtor or a dependent of the debtor claims as a homestead; shall be reduced to the extent that such value is attributable to any portion of any property that the debtor disposed of in the 10-year period ending on the date of the filing of the petition with the intent to hinder, delay, or defraud a creditor and that the debtor could not exempt, or that portion that the debtor could not exempt, under subsection (b), if on such date the debtor had held the property so disposed of.

11 U.S.C. § 522(o)(4).

6

The Eighth Circuit has addressed the question of whether § 522(o)(4) applies to "opt out" state exemptions. In re Addison, 540 F.3d 805, 811 (8th Cir. 2008). In Addison, the Eighth Circuit analyzed the application of § 522(o)(4) in a case where the debtor had elected to use the Minnesota state exemptions, including the homestead exemption. Id. The court concluded that state homestead exemptions are subject to the limitation found in § 522(o)(4). Id.

The Eighth Circuit Bankruptcy Appellate Panel applied and elaborated on the Eighth Circuit's decision in In re Cleaver: "While state law may govern the allowance of an exemption in the first instance, occasionally the Bankruptcy Code modifies some state exemption rights to prevent abuse or overreaching by debtors or creditors." In re Cleaver, 407 B.R. 354 (B.A.P. 8th Cir. 2009) (noting the application of § 522(o) to state homestead exemptions).

Under Addison and Cleaver, § 522(o)(4) applies here where Debtors claim the Iowa homestead exemption. The question here becomes whether there has been "abuse or overreaching by the debtors." Id. In applying that rule, however, Iowa law is not completely irrelevant. The Court must remember: "The Iowa homestead exemption has been broadly interpreted with a focus on its protective purpose." Roberts, 443 B.R. at 537.

7

## II.     Application of § 522(o)(4)

There are four separate elements that an objecting creditor must prove under § 522(o)(4):

> (1) the debtor disposed of property within the 10 years preceding the bankruptcy filing; (2) the property that the debtor disposed of was nonexempt; (3) some of the proceeds from the sale of the nonexempt property were used to buy a new homestead, improve an existing homestead, or reduce the debt associated with an existing homestead; and (4) the debtor disposed of the nonexempt property with the intent to hinder, delay or defraud a creditor.

In re Corbett, 478 B.R. 62, 69 (Bankr. D. Mass. 2012).  The parties agree that Trustee has shown element one because Debtors cashed in equity in their life insurance policy on March 6, 2013.  They also agree the cash they received went into Debtors' bank account for six days, and then Debtors wired that money to pay down their mortgage on March 12, 2013.  Therefore, Trustee has shown element three as well—setting aside for the moment the question of whether the asset was non-exempt, which is necessary for element two.  The primary dispute in this case is whether Trustee has shown the second and fourth elements necessary for § 522(o)(4)—that the property disposed of was non-exempt and that Debtors acted with the intent to hinder, delay, or defraud a creditor.

### A.     Element Two—Was the Property Disposed of Non-Exempt?

Trustee must show that the property Debtors disposed of was non-exempt. Trustee acknowledges that the life insurance may well have been exempt property.

Trustee argues, however, that even if that is the case, when Debtors converted their life insurance equity to cash and put it in their bank account, it became non-exempt property. Debtors argue Trustee is exalting form over substance. They argue the fact that the funds were temporarily non-exempt is a mere technicality. The funds had to remain in Debtors' bank account while the check cleared. To a certain extent, these cash funds did not really exist until the check cleared. Debtors assert that is more properly viewed as a case of converting one form of exempt property to another.

Iowa law allows Debtors to exempt insurance equity. Under Iowa Code § 627.6(6), a debtor may exempt:

> The interest of an individual in any accrued dividend or interest, loan or cash surrender value of, or any other interest in a life insurance policy owned by the individual if the beneficiary of the policy is the individual's spouse, child, or dependent.

Iowa Code § 627.6(6). This exemption has no limit. However, Iowa law only exempts cash in Debtors' bank account up to $1,000. Id. § 627.6(14) (exempting "debtor's interest, not to exceed one thousand dollars in the aggregate, in any cash on hand, bank deposits. . . ."). Thus, the question of whether Debtors converted exempt property or on-exempt property is critical. Under the life insurance exemption, the full $28,000 is exempt. Under the bank account exemption, only $1,000 is exempt and $27,000 remains for creditors.

9

In general, under Iowa law, "[e]xempt funds lose their exempt status if their form is changed by investment in other property." Benson v. Richardson, 537 N.W.2d 748, 757 (Iowa 1995) (citing MidAmerica Sav. Bank v. Miehe, 438 N.W.2d 837, 838 (Iowa 1989); Iowa Methodist Hosp. v. Long, 234 Iowa 843, 852, 12 N.W.2d 171, 175 (1944)). Here, the issue is slightly different. The question is whether exempt property loses its status when it is only temporarily in-between exempt forms. Some courts have specifically examined this issue.

The Bankruptcy Court for the Northern District of Ohio, for example, has held that funds retained their exempt status when a debtor temporarily placed money into a checking account for the specific purpose of converting exempt property into another form of exempt property. In re Cottrill, 118 B.R. 535 (Bankr. S.D. Ohio 1990) (citing Love v. Menick, 341 F.2d 680, 682 (9th Cir. 1965)). Cottrill pointed out that because the only way debtor could transfer the funds from one form of exempt property to the other was to act as an intermediary and personally transfer the money to his or her account before finalizing the transfer to the other exempt property. Cottrill also found persuasive the fact the money was in debtor's checking account for less than three weeks. Based on these facts, Cotrill concluded the money retained its exempt status throughout the transfer process. Id. at 539.

10

This Court agrees with the reasoning in Cottrill. The money in this case was only in the Debtors' bank account for six days. The only reason it was even in the account was to transfer it from the insurance company to the mortgage company. The money had to sit in the account in order to verify that the check cleared the bank. To some extent, Debtors never really had the money in the account until the check cleared. Therefore, on these facts, and in light of the state's policy of liberally interpreting exemptions, the Court concludes that the $28,000 was exempt at the time Debtors transferred it to their mortgage company.

### B.    Element Four — Was There Fraudulent Intent?

While the above finding is dispositive, the Court will nevertheless address the question of fraudulent intent. In doing so, the Court concludes that even if the funds did lose their exempt status while temporarily deposited in Debtors' bank account (which they did not), the Court finds that Debtors did not have the improper intent required in § 522(o)(4) to reduce their homestead exemption.

The parties dispute whether Trustee showed that Debtors acted "with the intent to hinder, delay, or defraud a creditor." Id. "The phrase 'with the intent to hinder, delay or defraud a creditor' contained in § 522(o) is . . . not defined in the Bankruptcy Code." In re Addison, 540 F.3d at 811 (quoting In re Fehmel, No. 07-60831, 2008 WL 2151797, at *7 (Bankr. W.D. Tex. May 22, 2008)). The case law is clear, however, that it requires more than a showing that debtor simply converted

11

non-exempt property to exempt property. "The touchstone for bankruptcy fraud is not the conversion of an asset from one form to another, which in many cases may simply allow a debtor to take advantage of legislatively sanctioned exemption provisions. Rather, the critical issue is whether the debtor had fraudulent intent." In re Grand Jury Proceedings, 609 F.3d. 909, 913–14 (8th Cir. 2010). "It is well settled that the mere conversion of non-exempt assets to exempt assets is not in itself fraudulent." Addison, 540 F.3d at 812 (quoting Sholdan II, 217 F.3d 1006, 1010 (8th Cir. 2000)); see also Hanson v. First Nat'l Bank, 848 F.2d 866, 868 (8th Cir. 1988) ("It is well established that . . . a debtor's conversion of non-exempt property to exempt property on the eve of bankruptcy for the express purpose of placing that property beyond the reach of creditors, without more, will not deprive the debtor of the exemption to which he otherwise would be entitled"); Norwest Bank Nebraska, NA v. Tveten, 848 F.2d 871, 873–74 (8th Cir. 1988) ("It is well established that under the Code the conversion of non-exempt to exempt property for the purpose of placing the property out of the reach of creditors, without more, will not deprive the debtor of the exemption to which he otherwise would be entitled.").

    The statute and case law thus require a showing of fraudulent intent. Because direct evidence of fraudulent intent is rarely available, the Eighth Circuit has stated that courts should apply the "badges of fraud" approach to determine

intent under § 522(o). Addison, 540 F.3d at 812. "Before actual fraudulent intent can be found there must appear in evidence some facts or circumstances which are extrinsic to the mere facts of conversion of non-exempt assets into exempt and which are indicative of such fraudulent purpose." Id. at 813 (internal citations and quotations omitted). "The sort of indicia of fraud necessary to find fraudulent use of an exemption would be, inter alia, conduct intentionally designed to materially mislead or deceive creditors about the debtor's position or use of credit to buy exempt property." Id. at 816 (quoting Matter of Armstrong, 931 F.2d 1233, 1237 (8th Cir. 1991)).

The Eighth Circuit has examined a variety of factors when determining whether a debtor's actions "crossed the line from legitimate bankruptcy planning to fraud." In re Grand Jury Proceedings, 609 F.3d at 913–14. Four indicia of fraud for a case under § 522(o)(4) are: "(1) conduct intentionally designed to materially mislead or deceive creditors about the conversion of assets; (2) use of credit to buy exempt property; (3) converting a "very great amount" of nonexempt property to exempt property; and (4) conveyances by the debtor for less than adequate consideration." In re Montanaro, 398 B.R. 688, 690 (Bankr. W.D. Mo. 2008) (citing Addison, 540 F.3d at 812). Other common badges of fraud include: "(1) actual or threatened litigation against the debtor; (2) a transfer of all or substantially all of the debtor's property; (3) insolvency on the part of the debtor;

13

(4) a special relationship between the debtor and the transferee; and (5) retention of the property by the debtor after the transfer." In re Wilmoth, 397 B.R. 915, 921–22 (B.A.P. 8th Cir. 2008).

The Eighth Circuit has addressed very similar cases on at least a couple of occasions. In Addison, the debtor discussed pre-bankruptcy planning with his attorney and then transferred $8,000 in nonexempt bank accounts into exempt Roth IRAs while insolvent. In re Addison, 540 F.3d at 807. Additionally, the debtor paid his mortgage down by $11,500 on the very day he filed for bankruptcy. Id. He then claimed exemptions on both the homestead's equity and the value of the Roth IRA under Minnesota exemption law. Id. The Eighth Circuit found that there was no "indicia of fraud other than the suit or threat of suit resulting from personal liability on a defaulted loan." Id. at 816. The Circuit continued: "Addison did not borrow money to place into exempt assets; he had a preexisting homestead; he did not obtain goods on credit, sell them, then place the money into exempt property; and he did not attempt to conceal the transfers in his bankruptcy filings." Id. The Circuit also found that the debtor's intent "to keep value away from creditors" was insufficient as evidence of fraud because "such an intent is not automatically impermissible." Id. at 815. Therefore, the Eighth Circuit allowed the exemptions. Id. at 817.

The Eighth Circuit also addressed this issue in Hanson v. First Nat. Bank, 848 F.2d 866 (8th Cir. 1988). In Hanson, the debtors met with an attorney and discussed pre-bankruptcy planning. Id. at 867. Debtors then sold several non-exempt assets to family members at fair market value. Id. The debtors took the proceeds from that sale and bought life insurance policies worth approximately $20,000. Id. Two days before filing for bankruptcy, they paid $11,033 towards their mortgage. Id. The debtors claimed the life insurance policies and homestead equity exempt. Id. The Eighth Circuit found that there was no extrinsic evidence of fraud because the debtors "did not borrow money to place into exempt properties; they accounted for the cash they received from the sales; they had a preexisting homestead; and they did not obtain goods on credit, sell them, and then place the money into exempt property." Id. at 869.

The Eighth Circuit, however, reached a different conclusion on slightly different facts in Norwest Bank Nebraska, N.A. v. Tveten, 848 F.2d 871 (8th Cir. 1988). In Tveten, the debtor sold almost all of his non-exempt property in 17 different transactions, totaling $700,000, before filing for bankruptcy. Id. at 872. He then used that liquidated property to purchase exempt life insurance. Id. The transfers left almost nothing remaining in the bankruptcy estate for the creditors to whom he owed almost $19,000,000. Id. The debtor stated that his purpose was to shield his assets from creditors. Id. at 873. The court found that the unlimited

nature of the exemption, combined with the large amount of the total transfer and the small remaining size of the bankruptcy estate, created extrinsic evidence of fraud. Id. at 876–77. The principle underlying Tveten can best be summarized as follows: "There is a principle of too much; phrased colloquially, when a pig becomes a hog it is slaughtered." Dolese v. United States, 605 F.2d 1146, 1154 (10th Cir. 1979); see also In re Zouhar, 10 B.R. 154, 157 (Bankr. D.N.M. 1981) (quoting the statement in the context of pre-bankruptcy planning); In re Krantz, 97 B.R. 514, 524 (Bankr. N.D. Iowa 1989) (same).

Trustee argues this case is different than Addison and Hansen because it involves more than just a conversion of non-exempt to exempt property. Trustee points to Debtors' omission of the transactions on their bankruptcy schedules, coupled with their statement that their schedules were correct and denial of any recent transactions are badges of fraud here. Debtors argue, and Mr. Arends specifically testified, that they had no fraudulent intent and the omissions and misstatements were inadvertent.

The Bankruptcy Court for the Western District of Missouri addressed a very similar case where the debtors converted assets from non-exempt to exempt and then omitted the information on their bankruptcy schedules. In re Montanaro, 398 B.R. 688 (Bankr. W.D. Mo. 2008). In Montanaro, the debtors cashed out $9,000 in mutual funds and invested it into Roth IRAs. Id. at 689. The debtors did not list

16

the interest in the IRAs on their bankruptcy schedules, however they brought the IRA paperwork to their initial meeting of creditors. Id. After the meeting, the debtors amended their bankruptcy schedules to include the IRAs. Id. The trustee objected to the debtors' claim of exemption. Id. The court found no extrinsic evidence of fraud based on the debtor's transfer and subsequent omission on the bankruptcy schedules. Id. at 692.

This case is factually very similar to Montanaro. Debtors transferred assets into exempt home equity on the eve of bankruptcy. In making that determination, the Court views the evidence of in light of the purpose of the homestead exemption.

> The Iowa homestead exemption has been broadly interpreted with a focus on its protective purpose. . . . In this state, homestead statutes are broadly and liberally construed in favor of exemption. Regard should be had to the spirit of the law rather than its strict letter. . . . The policy of our law is to jealously safeguard homestead rights.

In re Roberts, 443 B.R. at 537 (internal citations and quotations omitted). Viewing the evidence in this light, the Court finds there is insufficient extrinsic evidence of Debtors' alleged "intent to hinder, delay, or defraud a creditor."

Debtor Larry Arends testified that when he and his wife returned to their attorney's office to sign their bankruptcy schedules, there was not a follow up discussion on the life insurance, proceeds, or payment of their mortgage. He said

17

they only "skimmed" the schedules before signing, assuming their attorney had made the necessary adjustments. Debtors' attorney candidly stated at the hearing that the omission of the transfer from the bankruptcy schedules was entirely her fault. The Court greatly appreciates and applauds her candor, acceptance of responsibility for her error, and keeping a focus on her clients' interests even when it casts her in an unfavorable light.

The Court finds, based on all of these factors, that Debtors did not intentionally omit the information from their bankruptcy schedules. The Court specifically finds that Debtors believed that the schedules were correct when they answered Trustee's questions. The Court also finds that Debtors did not attempt to hide the transaction when they stated they had made no transactions. They simply misunderstood the question. Larry Arends testified that he thought the Trustee asked about payments other than towards their mortgage. The Court finds his testimony credible. As further evidence of lack of fraudulent intent, Debtors offered to go to get the bank statements they left in the car, which would have revealed the transaction. They sent those statements to Trustee the next day, as he requested. Thus, the Court finds that the Debtors were not engaged in conduct designed to mislead or defraud creditors.

This case is also similar to both Addison and Hanson. At most, Debtors converted non-exempt assets into exempt assets on the eve of bankruptcy, but there are not enough "badges of fraud" on this record to show fraudulent intent. Like the debtor in Addison, Debtors actions do not appear designed to mislead. In re Addison, 540 F.3d at 816. Debtors did not obtain dischargeable credit in order to increase their exemptions, the converted amount is not overly large, nor was the transfers for less than adequate consideration. Id. Additionally, like the debtor in Hanson, Debtors already owned the homestead. Hanson, 848 F.2d at 869. Like Montanaro, the Court does not find the omission of information on the bankruptcy schedules is enough to show fraudulent intent. In re Montanaro, 398 B.R. at 692. In short, the Court accepts and finds credible Mr. Arends testimony that they did not intend to defraud anyone and thought they were doing everything they were required to do.

## CONCLUSION

Debtors' $28,000 in life insurance proceeds did not lose its exempt status while the insurance check for that value cleared the bank. Debtors also did not act with the improper intent necessary to reduce their homestead exemption under § 522(o)(4). Therefore, Trustee's Objection to Debtors' Homestead Exemption is denied.

**IT IS HEREBY ORDERED** that the Objection to Debtor's Homestead Exemption is **DENIED**.

Dated and Entered:

March 4, 2014

_____
**THAD J. COLLINS, CHIEF JUDGE
UNITED STATES BANKRUPTCY COURT**